# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES OF AMERICA ex
rel. TIMOTHY MURPHY,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No. 1:19-cv-168** |
| **v.** | **JUDGE DOUGLAS R. COLE** |
| **TRIHEALTH, INC., et al.,** | |
| **Defendants.** | |

## OPINION AND ORDER

Relator Timothy Murphy purports to bring this False Claims Act (FCA) suit on behalf of the United States against TriHealth, Inc. (TriHealth), Good Samaritan Hospital of Cincinnati, Ohio (Good Samaritan), Bethesda Hospital, Inc. (Bethesda North) (the Court will refer to those two hospitals together as TriHealth Hospitals), and TriHealth G, LLC, d/b/a TriHealth Physician Partners (TriHealth Physicians).[1] Importantly, about ten months after Murphy brought suit, another relator, Dr. Set Shahbabian, also sued TriHealth and TriHealth Hospitals, along with the Mayfield Clinic, Inc. (Mayfield), on behalf of the United States under the FCA, in a strikingly similar action. (*See* Compl., *United States ex rel. Shahbabian v. TriHealth, Inc., et al.*, No. 1:20-cv-67 (S.D. Ohio Jan. 27, 2020), Doc. 1).

---

[1] Murphy originally named various other TriHealth entities, as well, but he has narrowed Defendants to TriHealth, TriHealth Hospitals, and TriHealth Physicians. (*See* Sec. Am. Compl., Doc. 50, #551).

Defendants moved to dismiss the present action under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (along with 9(b)). (12(b)(1) Mot., Doc. 64; 12(b)(6) Mot., Doc. 66). And TriHealth, TriHealth Hospitals, and Mayfield likewise moved to dismiss in *Shahbabian* on the same grounds. (*Shahbabian*, No. 1:20-cv-67, Docs. 38, 40, 42, 45). In both cases, the respective defendants assert that the FCA violates Article II's Appointments and Take Care Clauses, and that the respective relators lack standing under Article III. (In *Shahbabian*, the defendants further argue that the instant action also bars Shahbabian's suit under the FCA's first-to-file rule.) Given the overlap between the two cases, the Court held in abeyance its rulings in either case to allow for complete briefing in both cases. (2/24/2025 Not. Order).

Now, for the reasons more fully set forth below, the Court **DENIES** Defendants' Rule 12(b)(1) motion (Doc. 64) as to Murphy's Article III standing and the FCA's constitutionality under Article II. Recent Supreme Court precedent dooms the first argument, and long-settled Sixth Circuit precedent dooms the second. The Court also **DENIES** Defendants' 12(b)(6) motion (Doc. 66) because the Complaint[2] states a claim under the FCA. That said, the Court **CERTIFIES** this Order for interlocutory appeal under 28 U.S.C. § 1292(b). Recent developments in Supreme Court caselaw could cause reasonable jurists to disagree, at least on the question of the FCA's constitutionality under Article II. And given that a different outcome on that issue would be dispositive of the matter, coupled with the extensive discovery

---

[2] The operative Complaint in this case is the Second Amended Complaint (Doc. 50). For ease of reference, though, the Court will refer to it simply as the "Complaint" throughout this Opinion and Order.

that an FCA action like this one likely will entail (discovery that would be pointless if the relators are constitutionally defective), the Court concludes that the parties, and the judicial system, are better served by resolving that constitutional issue now rather than later. Further, the Court **STAYS** this case until that interlocutory appeal process is complete.

## BACKGROUND[3]

TriHealth is a corporate partnership between Good Samaritan and Bethesda North hospitals. (Sec. Am. Compl., Doc. 50, #559). It employed Murphy as Physician Practices Chief Financial Officer. (*Id.* at #558). In that role, Murphy oversaw finances for TriHealth Physicians. (*Id.*). And TriHealth Physicians, for its part, employs over 500 physicians within the TriHealth system. (*Id.* at #561).

During his time at TriHealth, Murphy asserts that he witnessed a far-reaching illegal scheme to increase TriHealth Hospitals' patient market share. (*Id.* at #558–59). In furtherance of this scheme, Murphy says that (1) TriHealth Physicians paid physicians for referrals to TriHealth Hospitals, (2) TriHealth and TriHealth Hospitals subsidized TriHealth Physicians to cover these referral payments, and (3) TriHealth Hospitals paid "sham management fees" to physicians in exchange for referrals. (*Id.* at #556–57). According to Murphy, this scheme violated two federal

---

[3] Because this matter comes before the Court on various motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1) (specifically, as a facial attack to subject-matter jurisdiction), the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court reminds the reader that they are just that—allegations. The Court discusses the factual allegations in greater detail within the Rule 9(b) analysis below.

statutes: the Stark Act and the Anti-Kickback Statute (AKS). (*Id.* ¶ 9). As a result, he says, Defendants violated the FCA when they presented claims for reimbursement to federally funded health insurance programs and falsely certified compliance with those laws. (*Id.* at #557; *see also* Docs. 50-6, 50-7 (examples of cost reports); Docs. 50-8, 50-9, 50-10, 50-11 (examples of allegedly false claims)).

Relatedly, Murphy claims he repeatedly objected to Defendants' payments to physicians for referrals. (*Id.* at #711–25). In response to those complaints, TriHealth leadership allegedly threatened Murphy's job if he would not comply with their physician-compensation scheme. (*Id.* at #720–21). Then, when Murphy continued to object, TriHealth leadership ordered him to resign. (*Id.* at #724).

Murphy responded by suing TriHealth, TriHealth Hospitals, and TriHealth Physicians both on behalf of (1) the United States for FCA violations, and (2) himself for violation of the FCA's anti-retaliation provisions. (*Id.* at #725–32). Then, roughly ten months later, Shahbabian, a former TriHealth neurosurgeon, initiated a separate FCA qui tam action against TriHealth, TriHealth Hospitals, and Mayfield. (*See Shahbabian*, No. 1:20-cv-67, Doc. 1). There, Shahbabian claims that TriHealth, TriHealth Hospitals, and Mayfield engaged in a similar referral compensation scheme. (*See generally id.*).

Murphy and Shahbabian filed their respective Complaints under seal as the FCA requires. The United States declined to intervene in either case. (Doc. 23; *Shahbabian*, No. 1:20-cv-67, Doc. 17). Subsequently, the Court ordered the operative

Complaints unsealed and served on the appropriate defendants. (Doc. 24; *Shahbabian*, No. 1:20-cv-67, Doc. 18).

In this case, TriHealth, TriHealth Hospitals, and TriHealth Physicians moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docs. 64, 66). In support of their Rule 12(b)(1) motion, Defendants argue that the FCA is unconstitutional under Article II and that, as a result, Murphy lacks Article III standing. (12(b)(1) Mem., Doc. 65). Murphy responded to both motions, (Docs. 70, 71), and Defendants replied to each response (Docs. 72, 73). The United States then intervened solely to file a response to the constitutional challenge, (Doc. 75), to which Defendants replied, (Doc. 76).

In *Shahbabian*, TriHealth, TriHealth Hospitals, and Mayfield moved to dismiss under Rules 12(b)(1) and 12(b)(6). (*Shahbabian*, No. 1:20-cv-67, Docs. 38, 40, 42, 45). Their Rule 12(b)(1) motions raise the same constitutional issues as in this case. (*See, e.g.*, Mem., *Shahbabian*, No. 1:20-cv-67, Doc. 39). Murphy moved for joint determination of related issues with *Shahbabian*, which the Court granted in part. (2/24/2025 Not. Ord.). Briefing is now complete in both cases.

## LAW AND ANALYSIS

Defendants press constitutional arguments under both (1) Article II's Take Care and Appointments Clauses and (2) Article III's standing requirements. (Doc. 65, #840–50). And they further claim that both types of arguments go to this Court's subject-matter jurisdiction. But that is not so. According to the Supreme Court, "the validity of *qui tam* suits under those [Article II] provisions [is not] a jurisdictional

issue." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000). As a result, Defendants likely should have raised their Article II challenge under Rule 12(b)(6) rather than Rule 12(b)(1). That said, the Court looks past the mislabeling and "proceed[s] to address whether [Defendants'] allegations state a claim." *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010). But that raises another wrinkle. In particular, "[c]ourts should avoid unnecessary constitutional questions." *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002). As the Article II issue is not jurisdictional, the Court does not need to address it before considering the merits of Defendants' other arguments. And the Court would not need to reach the Article II issue at all if Murphy otherwise fails to state a claim under the FCA. Accordingly, the Court proceeds as follows: it starts with the Article III standing challenge (which does go to subject-matter jurisdiction), but the Court then addresses Defendants' statutory challenges to the claims, and only after determining that Defendants' arguments fail on those two fronts does it address the Article II issue. Ultimately, though, the Court concludes that Murphy has standing as a relator and that Defendants do not prevail on any of their arguments for dismissal, including the Article II issue.

## A.    Relators Have Article III Standing.

Article III limits courts to deciding "Cases" and "Controversies." The Supreme Court has long held that, to fall within those categories, a plaintiff must establish that he has standing to sue. Here, Defendants claim that Murphy lacks standing. But that argument largely turns on their claim that his role as the relator in this action

violates Article II's Appointments and Take Care Clauses. So, it is those latter arguments that ultimately matter here. But that is a problem for Defendants because, as described below, Supreme Court precedent squarely forecloses reliance on the Article II argument as a standing argument.

No one disputes that, to have standing to sue, a party must satisfy three elements: an injury in fact, causation, and redressability. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Nor is there any real dispute that the alleged over-billing did not injure Murphy personally. Murphy, after all, was not the party who paid the bills. Of course, he would have an injury in fact in his personal capacity for his retaliation claims, as he lost his job. But "standing is not dispensed in gross," meaning a plaintiff must show standing for every claim and every form of relief that he or she seeks to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quotation omitted). So, as a private party, Murphy clearly could pursue his retaliation claims, but it is less clear that he has suffered any injury that would allow him to likewise pursue the overbilling claims.

That, however, isn't the end of the story. The FCA creates civil liability for presenting false claims to the United States for payment. *Stevens*, 529 U.S. at 768–69 (citing 31 U.S.C. § 3729(a)). The statute further provides that the United States need not itself initiate the action against the alleged false claimant. Rather, "a private person (the relator) may bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'" *Id.* (quoting 31 U.S.C. § 3730(b)(1)). And if the action is successful, the

7

relator is entitled to a portion of the recovery. *Id.* at 769–70. Based on that framework, the Supreme Court has expressly held that an FCA relator meets Article III standing requirements through "partial assignment of the Government's damages claim." *Id.* at 773–74.

Not so fast, Defendants say. They argue that the FCA's qui tam provisions run afoul of yet another part of the Constitution: Article II. And, because relators lack proper authorization under Article II, Defendants claim, relators cannot pursue an FCA suit, meaning that they lack standing under Article III (as they do not have the requisite personal interest in the suit). (Doc. 65, #849).

The problem for Defendants is that *Stevens* squarely forecloses this argument. In *Stevens*, while "express[ing] no view on the question whether *qui tam* suits violate Article II," 529 U.S. at 778 n.8, the Court found "no room for doubt that a *qui tam* relator under the FCA has Article III standing," *id.* at 778. The Supreme Court's more recent decisions in *United States ex rel. Polansky v. Executive Health Resources Inc.*, 599 U.S. 419 (2023), and *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019), further confirm that result. While the Supreme Court did not mention standing in either case, it cited *Stevens* in both (thereby suggesting that *Stevens* remains good law). And in *Polansky*, the Court endorsed the basis for the *Stevens* holding that a relator's standing arises from the government's injury: "The FCA, we have explained, 'effect[s] a partial assignment of the Government's' own damages claim." 599 U.S. at 425 (quoting *Stevens*, 529 U.S. at 773). In *Cochise*, the Court proceeded to judgment in an intervention-declined FCA action. *See* 587 U.S. at

267, 272. And importantly, the Supreme Court "bear[s] an independent obligation to assure [itself] that jurisdiction is proper before proceeding to the merits." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008). So presumably that means the Supreme Court concluded that the relator in *Cochise* had standing, just like *Stevens* says.

Nowhere do Defendants explain why *Stevens* would not bind this Court. True, they make clear that they *disagree* with *Stevens*: "the back-door manner in which the [*Stevens*] Court circumvented the Constitution and Separation of Powers doctrine by conferring standing purely by legislative assignment renders this standing theory incorrect." (Doc. 65, #849). But their disagreement with Supreme Court precedent does not provide a basis for this Court to ignore it. Even if *Stevens* "appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Unless and until overruled, *Stevens* dictates that, as a qui tam relator, Murphy has Article III standing to bring this action.

## B. Murphy's Complaint States a Claim under the FCA.

The Court next turns to whether the Complaint states a claim under the FCA. "In the *qui tam* context, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible

on its face." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 502 (6th Cir. 2008) (cleaned up).

Importantly, Federal Rule of Civil Procedure 9(b) applies to FCA claims. *United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 513–14 (6th Cir. 2022). To comply with Rule 9(b), the relator "at a minimum, must 'allege the time place, and content of the alleged misrepresentation on which [the government] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). "When a relator 'alleges a complex and far-reaching fraudulent scheme, then that scheme must be pleaded with particularity and the complaint must also provide examples of specific fraudulent conduct that are representative samples of the scheme.'" *USN4U*, 34 F.4th at 514 (quoting *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 830 (6th Cir. 2018)) (cleaned up).

The FCA aims to stop fraud on the government. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181–82 (2016). To that end, the FCA provides that:

> [A]ny person who—
>
> > (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> >
> > (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> >
> > (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)
> >
> > …

10

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty … plus 3 times the amount of damages[.]

31 U.S.C. § 3729(a)(1).

As a relator, Murphy brings direct claims under subparagraphs (A) and (B), conspiracy claims under (C), and reverse claims under (G). On his own behalf, Murphy brings a retaliation claim under the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

### 1.    **Direct Claims**

To state a claim under subparagraph (A), Murphy must allege that Defendants (1) knowingly (2) presented or caused to be presented for payment or approval (3) a false or fraudulent claim. *United States ex rel. Prather v. Brookdale Senior Living Cmtys.*, 838 F.3d 750, 761 (6th Cir. 2016) (citing *Bledsoe*, 342 F.3d at 640). To state a claim under subparagraph (B), Murphy must allege that Defendants (1) knowingly (2) made, used, or caused to be made or used a false statement or false record (3) material to the federal government's decision to pay (4) a submitted claim. *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016).

Murphy's direct claims rely on underlying AKS or Stark violations. To support his subparagraph (A) claims, for example, Murphy asserts that Defendants submitted claims that were "false" because of underlying AKS and Stark violations. (Doc. 71, #1223). Then for the subparagraph (B) claims, Murphy contends that Defendants

11

falsely certified compliance with AKS and Stark and used false records to conceal payments that violated AKS or Stark. (*Id*. at #1223 n.7).

Defendants, however, do not differentiate between Murphy's subparagraph (A) and (B) claims. Instead, Defendants challenge two partially overlapping elements: falsity and knowledge. (Doc. 67, #868–92). They say Murphy failed to plead with particularity the underlying AKS and Stark violations. And, in any event, even if Murphy has made a prima facie case under AKS or Stark, Defendants contend that Murphy's allegations fall within those laws' respective exceptions. More than that, Defendants contend that Murphy has not plausibly alleged that they knew about the AKS or Stark violations when submitting the purportedly false claims.

### a.   Prima Facie AKS Violations

The AKS establishes criminal and civil liability for "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person … to refer an individual to a person for the furnishing … of any item or service" reimbursable under a federal healthcare program. 42 U.S.C. § 1320a-7b(b)(2)(A). Under the 2010 amendment to the AKS, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." *Id*. § 1320a-7b(g).

As a threshold matter, the parties dispute the 2010 amendment's implications. Defendants argue that an AKS violation only makes claims "false" under the FCA if the "claims submitted to federal healthcare programs would not have been submitted

12

*but for* the alleged kickbacks." (Doc. 67, #877 (citing *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–55 (6th Cir. 2023))).

Murphy, by contrast, argues that the 2010 amendment does not supplant previously recognized liability theories, even for subparagraph (A) claims based on AKS violations. (Doc. 71, #1240). Under one such theory,[4] "compliance with the AKS is a material condition of reimbursement of every payment by the government and the failure to comply with such material condition renders the claim for payment a false claim." (*Id.* at #1241). Murphy argues that his allegations meet this causation requirement because Defendants' "knowing conduct was a substantial factor in bringing about the submission of claims, and the 'critical event that caused the claims to be false.'" (*Id.* at #1244 (quoting Doc. 50, ¶¶ 543–44)). Murphy also argues that "the requisite causal connection is established when 'Defendants knew that their actions would, if successful, result in the submission by [providers] of compliance certifications required by Medicare that [the defendants] knew would be false." (*Id.* at #1243 (quoting *United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 277–78 (D. Mass. 2010)) (alterations in original)).

---

[4] Murphy refers to this theory as one of "material falsity" or seemingly interchangeably, "false certification." (Doc. 71, #1240). Courts have divided FCA claims, including those involving AKS violations, into "judicially created formal categories" such as: factually or legally false, and legally false by express or by implied certification. *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 385 (1st Cir. 2011). "The text of the FCA does not refer to 'factually false' or 'legally false' claims, nor does it refer to 'express certification' or 'implied certification' … [nor] 'certification' at all." *Id.* (citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006)). So the Court elects to use the categories the text provides: subparagraphs (A) and (B).

Both parties are half right. Under the 2010 amendment, an AKS violation automatically makes a claim "false" if that claim that "includes items or services resulting from" the violation. *See* 42 U.S.C. § 1320a-7b(g). And, at least in the Sixth Circuit, "resulting from" means "but-for causation." *Hathaway*, 63 F.4th at 1052. So an AKS violation gives rise to a subparagraph (A) claim when a defendant knowingly presents (or causes to be presented) a claim for items or services which the claim would not include but for the AKS violation. The 2010 amendment "would have little practical effect" if it did not cut off other theories that "depend exclusively" on AKS violations to establish falsity but do not require but-for causation. *United States ex rel. Louderback v. Sunovion Pharms., Inc.*, 703 F. Supp. 3d 961, 980 (D. Minn. 2023). But not all Murphy's claims depend exclusively on AKS violations. For some, "it is not the AKS violation itself that renders the claim false [but] the false representation that there is no AKS violation." *United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 333 (1st Cir. 2025). These fit neatly under subparagraph (B).

In sum, Murphy must allege an AKS violation for both subparagraph (A) and (B) claims. But the paths from AKS violation to FCA liability differ. For subparagraph (A) claims, Murphy must allege that the submitted claims "include[] items or services resulting from" an AKS violation in order to allege that the submitted claims were "false." 31 U.S.C. § 3729(a)(1)(A). For subparagraph (B) claims, Murphy must allege that material statements and records concealing or denying an AKS violation were "false," so he invariably must allege that an AKS violation truly occurred. *See* 31 U.S.C. § 3729(a)(1)(B).

To make a prima facie case for an AKS violation, Murphy must allege that Defendants (1) "knowingly and willfully" (2) "offer[ed] or pa[id] any remuneration" (3) to induce referrals for "any item or service" reimbursable under a federal healthcare program. *Hathaway*, 63 F.4th at 1048 (quoting 42 U.S.C. § 1320a–7b(b)(2)(A)) (emphasis omitted).

Murphy contends that Defendants violated AKS in two ways: (1) TriHealth and TriHealth Hospitals transferred $508 million in subsidies to TriHealth Physicians to induce referrals, and (2) TriHealth and TriHealth Hospitals paid "sham management fees" directly to physicians in exchange for referrals. (Doc. 71, #1224). Defendants argue that Murphy has not met the remuneration element for the subsidies nor the inducement element for the management fees.[5] (Doc. 67, #868–71). And even if Murphy has done so, Defendants contend that he has not alleged with particularity that any submitted claims included items or services resulting from an AKS violation. (*Id*. at #877–79). Take the subsidies and management fees in turn.

Starting with the former, the Court concludes the Complaint pleads with sufficient particularity the remuneration element as to the subsidies. To induce referrals, TriHealth Physicians allegedly paid physicians amounts above what their personal productivity generated. (Doc. 50, #633). What's more, the Complaint details specific examples where TriHealth and TriHealth Physicians used projected referral

---

[5] In a footnote, Defendants say that the Complaint fails to allege that Defendants acted "knowingly" or "willfully." (Doc. 67, #870 n.2). But beyond that, Defendants do not develop their argument. And in any event, the Complaint alleges that Defendants engaged in an intentional scheme to pay for referrals despite knowledge of AKS requirements and direct warnings from Murphy and others. (*E.g.*, Doc. 50, #619–20).

profits to determine physician compensation. (*E.g.*, *id.* at #595–97). As a result, TriHealth Physicians apparently lost $75.62 million in fiscal year (FY) 2014, $88.41 million in FY 2015, $103.91 million in FY 2016, $109.32 million in FY 2017, $124.78 million in FY 2018, and expected to lose more than $160 million in FY 2019. (*Id.* at #634). Each year, TriHealth and TriHealth Hospitals subsidized TriHealth Physicians "to cover the financial losses" because, as TriHealth's CFO Andrew DeVoe said, the subsidies would "ultimately benefit the hospital side of the business." (*Id.* at #635). The Complaint also alleges that TriHealth leadership "deliberately orchestrated the losses to induce and reward referrals." (*Id.*). And they did so because these increased referrals led to increased profits for TriHealth and TriHealth Hospitals that "more than offset the losses from physician over-compensation." (*Id.* at #639). Hospital operations profits reached "$113.96 million in FY 2014, $133.05 million in [FY] 2015, $155.05 million in FY 2016, $159.98 million in FY 2017, and $186.46 million in FY 2018." (*Id.*). These profits validated TriHealth leadership's "successful physician strategy" of "[m]anaging up the return, rather than managing down the loss." (*Id.* at #640).

True, Defendants point to other paragraphs in the Complaint that quantify the subsidies in more general terms. (Doc. 72, #1288 (citing Doc. 50, ¶¶ 278, 282, 285, 286, 291)). But Defendants overlook that these general terms refer to the specific amounts alleged in the intervening paragraphs. (*See, e.g.*, Doc. 50, ¶¶ 280, 282, 291, #634–37 ("the financial losses" in paragraph 282 refers to the exact loss amounts

alleged in paragraph 280, and the "over $500 million" in paragraph 291 refers to the total of the subsidized financial losses from 2014 to 2019 detailed in paragraph 280)).

As for the management fees, the Complaint adequately pleads those too. Under the AKS, "induce" means "the necessary intent to lead or move by influence or persuasion." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015) (cleaned up). And Federal Rule of Civil 9(b) says a plaintiff may generally allege "intent, knowledge, and other conditions of a person's mind." Under that standard, Murphy sufficiently alleges that Defendants overcompensated referring physicians for the purpose of obtaining their referrals. Specifically, the Complaint says Defendants paid referring physicians "management fees," on top of their employment compensation, without requiring that those physicians engage in any additional duties, or provide any additional services, to earn those fees. (*E.g.*, Doc. 50, #672). Because the value of zero additional required duties or services is necessarily zero, the management fees necessarily reflect payments above the fair market value for the physicians' services (which had already been compensated through the employment compensation). This alleged something-for-nothing exchange supports an inference that Defendants paid the management fees to induce referrals. *See United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 171 (3d Cir. 2019) ("Compensation for personal services above the fair market value of those services can suggest that the compensation is really for referrals.").

Murphy has also pleaded that submitted claims included items or services resulting from kickbacks. For example, Murphy alleges that TriHealth and TriHealth

Physicians agreed to increase payments to gastroenterologists to retain $40 million in profits from referrals, and that TriHealth and TriHealth Hospitals subsidized TriHealth Physicians' resulting losses. (Doc. 50, #595–97, 635). After TriHealth and the gastroenterologists reached the retention agreement, TriHealth Hospitals submitted claims for services referred by the same gastroenterologists. (*Compare id.* at #596–97, *with* Doc. 50-11, #766–67).

Taking all that together, Murphy has set out a prima facie case for AKS violations that could support his subparagraph (A) and (B) direct claims.

### b. Prima Facie Stark Violations

Turn now to the alleged Stark Law violations. The Stark laws broadly ban healthcare entities from submitting Medicare claims for designated health services when the provider has a financial relationship with the referring doctor not subject to an exception. *United States ex rel. Daugherty v. Bostwick Lab'ys*, No. 1:08-cv-354, 2012 WL 6593804, at *6 (S.D. Ohio Dec. 18, 2012) (citing 42 U.S.C. § 1395nn).

Recall that, to allege an FCA violation, Murphy must plausibly allege falsity. *See supra* Part B.1. One way he can do so for his subparagraph (A) claims is by alleging a Stark violation. Other circuits have held, and Defendants do not contest, that a Medicare claim that violates Stark is a "false claim." *E.g.*, *Bookwalter*, 946 F.3d at 169; *United States ex rel. Pogue v. Diabetes Treatment Centrs. of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008). To meet the falsity element for his subparagraph (B) claims, Murphy must follow the same path as for the AKS violations. He must allege

that Defendants violated Stark to support his allegations that records or statements denying or concealing the Stark violation were false.

To make a prima facie case for a Stark Act violation, Murphy must allege: (1) a referral for designated health services, (2) a financial relationship, and (3) a Medicare claim for the referred services. *Bookwalter*, 946 F.3d at 169. Under Stark, a financial relationship includes a compensation arrangement involving "any remuneration directly or indirectly, overtly or covertly, in cash or in kind" between physician and the entity providing the referred services. 42 U.S.C. § 1395nn(a)(2), (h)(1). Defendants do not dispute that TriHealth Hospitals submitted claims for designated health services that TriHealth Physicians' employed doctors referred.

Murphy contends that TriHealth and TriHealth Physicians agreed to pay referring physicians remuneration that took into account referral volume. According to Murphy, TriHealth and TriHealth Hospitals subsidized TriHealth Physicians for these employment compensation payments. Additionally, as described above, TriHealth Hospitals allegedly paid referring physicians sham management fees based on referral volume. In Defendants' view, though, Murphy's allegations regarding the employment compensation payments fall short of plausibly alleging a direct or indirect compensation arrangement. (Doc. 67, #879–84).[6]

Start with whether Murphy plausibly alleged a direct compensation arrangement based on referred services from physicians to TriHealth or TriHealth

---

[6] Defendants do not contest that TriHealth Hospitals had a direct relationship in the sense of paying physicians management fees. (*See* Doc. 67, #880). Defendants argue only that those management fees fall into a Stark exception, as discussed below.

Hospitals. He hasn't. A direct compensation arrangement requires remuneration between referring physician and provider "without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i). Murphy argues that, together, Defendants were "functionally the same entity." (Doc. 71, #1250 (quoting Doc. 50, ¶ 109)). To bootstrap that position, he points to allegations that TriHealth controlled TriHealth Physicians' physician compensation decisions and that TriHealth and TriHealth Hospitals "financed the overpayments to employed physicians by channeling tens of millions of dollars" in subsidies to TriHealth Physicians. (*Id.* at #1250–51). But all these allegations establish is that TriHealth Physicians is an intervening entity— remuneration from TriHealth and TriHealth Hospitals passed through TriHealth Physicians on its way to the employed referring physicians.[7] And that won't do for showing a direct compensation arrangement.

Turn next to whether Murphy plausibly alleged an indirect compensation arrangement. Here, he fares better. To plead an indirect compensation arrangement under the then-applicable regulations, Murphy must allege: (1) an unbroken chain of financial relationships between the referring physicians and the entity providing referred services; (2) an entity in the chain pays the referring physicians aggregate compensation that "varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the [entity providing referred services]"; and (3) the entity providing referred services "has actual

---

[7] There may well be a direct financial relationship between TriHealth Hospitals and TriHealth Physicians (Doc. 71, #1251), but that does not create a direct relationship between TriHealth Hospitals and physicians who contract with TriHealth Physicians.

knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician" has such a compensation arrangement. 42 C.F.R. § 411.354(c)(2) (effective Jan. 1, 2019, until Nov. 19, 2021).[8] Consider each of the three elements.

First, Murphy has alleged an unbroken chain of financial relationships. He says TriHealth Physicians paid referring physicians employment compensation. TriHealth and TriHealth Hospitals paid TriHealth Physicians subsidies that "more than offset the losses from physician over-compensation." (Doc. 50, #639). And, as discussed above, Murphy's allegations about the subsidies meet Rule 9(b)'s particularity requirements. *See supra* Part B.1.a.

Second, Murphy has alleged that the referring physicians' compensation took into account referral value or volume. The Complaint explains how TriHealth leadership compiled proformas to set physician compensation based on projected profits from physician referrals. (Doc. 50, #588, 623). These proformas regularly included financial losses on the "physician practice side" offset by projected hospital profits from physician referrals. (*Id.* at #592). The Complaint further details numerous examples of these physician compensation agreements. (*E.g.*, *id.* at #595–97). Plus, the allegations specify that TriHealth leadership authorized these agreements to obtain or protect referrals. For example, discussing negotiations with oncologists, TriHealth Executive Vice President Robert Cercek allegedly said, "We

---

[8] This regulation included the language "varies with, or takes into account, the volume or value of referrals" at all relevant times. The current regulation does not include the phrase "or takes into account." *See* 42 C.F.R. § 411.354(c)(2) (effective Jan. 1, 2022).

need to close this deal. We can't risk losing $80 million in contribution margins. We believe it will only take another $20,000–30,000 per doc to get this done." (*Id.* at #616). Regarding one physician hire, the TriHealth Physicians Chief Physician Executive wrote, "a practice proforma … shows a loss of around $400k per year … Last year we lost about $1.5M in care retention to [another health system] … that would be retained if we hire him. He would also generate … radiation therapy, chemotherapy, surgery, hospitalization, etc." (*Id.* at #605). "It stands to reason that if a hospital provides fixed compensation to a physician that is not based solely on the value of the services the physician is expected to perform, but also takes into account additional revenue the hospital anticipates will result from the physician's referrals, that such compensation by necessity takes into account the volume or value of such referrals." *United States ex rel. Drakeford v. Tuomey Healthcare Sys.*, 675 F.3d 394, 409 (4th Cir. 2012). Just so here.

Defendants disagree. They argue that the physician compensation nonetheless did not include referrals as a "variable" that "correlates with" the number of referrals. (Doc. 67, #881–82 (emphasis omitted)). But Defendants depend on a new Medicare rule—42 C.F.R. § 411.354(d)(5)—that did not take effect during the relevant period. (*See id.* (citing 84 Fed. Reg. 55766, 55793 (Oct. 17, 2019)). So that argument is a nonstarter.

Defendants next assert that there could be reasons other than referral profits to hire a physician at a loss, adding that the allegations suggest physician compensation was set prior to referral projections. They base this conclusion on the

22

Complaint's use of the phrase "without considering," as in a proforma "listed financial losses of -$2.074 million *without considering* the 'downstream' hospital revenues from referrals." (*Id.* at #882 (quoting Doc. 50, ¶ 180)). But such arguments do not construe the allegations in the relator's favor, as the Court must. And when so construed, those allegations suggests that the financial losses may not be problematic *precisely because* they would be offset by hospital revenue earned through referrals.

That leaves the third and final element of an indirect compensation arrangement, which Murphy has likewise sufficiently alleged. He says Defendants knew the physician compensation arrangements took into account referrals since TriHealth controlled both TriHealth Hospitals and TriHealth Physicians. (*See* Doc. 50, #586). According to Murphy, TriHealth leadership set compensation based on referrals and signed off on the compensation agreements between TriHealth Physicians and the referring physicians. These agreements led to losses for TriHealth Physicians, but generated referral-driven profits for TriHealth and TriHealth Hospitals. TriHealth and TriHealth Hospitals then subsidized TriHealth Physicians' losses. Based on these allegations, it is at least plausible to believe that Defendants knew (or recklessly disregarded) that referring physicians' compensation took into account referrals. *See Bookwalter*, 946 F.3d at 174–75 (finding Stark's scienter element met for all defendants where the defendant medical center approved physician compensation and had control over the defendant hospitals because "with common control comes common knowledge").

23

c.    **Safe Harbors and Exceptions**

Defendants next contend that their conduct falls within the AKS's safe harbors and Stark's exceptions, which means Murphy has failed to state a claim. According to Defendants, the employment compensation at issue fits the Stark bona fide employee exception, (Doc. 67, #884), and the management fees fall into the Stark personal services exception and the AKS safe harbor with the same contours, (*id.* at #887–88). Murphy fires back that it's not his burden to plead around any exceptions or safe harbors since those are affirmative defenses Defendants must prove. (Doc. 71, #1227–30). Defendants disagree, claiming Murphy must plead that no AKS or Stark exception applies to meet the FCA's knowledge and falsity elements. (Doc. 72, #1288–91).

Admittedly, Defendants' pleading argument has "simple and cogent" logic. *Bookwalter*, 946 F.3d at 177. Conduct that falls within an exception does not violate AKS or Stark. And the allegedly false claims (and corresponding false statements and records) are only "false" if Defendants actually violated AKS or Stark. Further, even if an exception did not apply but Defendants believed one did, then Defendants may not have acted knowingly as the FCA defines the term. So one could understand the argument that to meet the FCA's falsity and knowledge elements, Murphy must plead around the exceptions—a prima facie case is not enough.

So far as the Court can tell, the Sixth Circuit has not decided this question. True, the Third Circuit has, and it rejected Defendants' argument. *Bookwalter*, 946 F.3d at 177. According to the *Bookwalter* court, while the "argument has force," Third

Circuit precedent compelled the court to rule the other way. *Id.* (citing *United States ex rel. Kosenske v. Carlisle HMA, Inc.,* 554 F.3d 88, 95 (3d Cir. 2009)). And what was the basis for that precedent? Well, the *Kosenske* holding stems from *United States v. Shaw*, 106 F. Supp. 2d 103 (D. Mass. 2000). *See Kosenske*, 554 F.3d at 95 (citing *United States v. Rogan*, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), which in turn cites *Shaw*). But *Shaw* was an AKS criminal prosecution that did not involve the FCA. *Shaw*, 106 F. Supp. 2d at 122. Rather, the *Shaw* court held that the government did not need to plead around AKS exceptions *in an indictment* because the exceptions do not serve as additional prima facie elements. *Id.* at 122. But that answer does not meet the question here. *See United States v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 268 n.3 (D. Mass. 2016) (concluding that "the analysis is slightly different" under the FCA as opposed to the AKS and Stark when it comes whether a plaintiff must plead around safe harbors and exceptions). In short, then, the Sixth Circuit has not answered the question, and the Court is dubious about the basis for the Third Circuit's decision.

Luckily, however, the Court need not answer this thorny question for present purposes. That's because, even though he contends he did not need to do so, Murphy *has* pleaded around the exceptions. Specifically, each exception applies only if the physician compensation at issue did not "take into account" referral volume or value. 42 C.F.R. § 1001.952(d)(1)(iv) (AKS personal services safe harbor); *id.* § 1395nn(e)(3)(A)(v) (Stark personal services exception); § 1395nn(e)(2)(B) (Stark bona fide employee exception); *see also Bookwalter*, 946 F.3d at 177. As discussed above, the Complaint alleges that the referring physicians' employment

25

compensation was in fact based on projected referral volume and that TriHealth Hospitals paid the management fees to induce referrals. Taking those allegations as true, the exceptions and safe harbor would not apply.

*    *    *

To summarize, Murphy has adequately pleaded that Defendants' conduct violated the AKS and Stark and did not fit any exception. He has identified specific claims for services referred by doctors who had financial relationships with Defendants that allegedly violated Stark and specific claims for services resulting from the alleged AKS violations. And Defendants do not contest that Murphy has alleged that Defendants certified compliance with AKS and Stark. Therefore, Murphy has met the FCA's falsity element for his subparagraph (A) and (B) claims.

### d. Defendants' Knowledge

Separately, Defendants argue that Murphy failed to plausibly or particularly plead knowledge under the FCA. The FCA defines its scienter requirement as follows:

> [T]he terms "knowing" and "knowingly"—
>
> > (A) mean that a person, with respect to information—
> >
> > > (i) has actual knowledge of the information;
> > >
> > > (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> > >
> > > (iii) acts in reckless disregard of the truth or falsity of the information; and
> >
> > (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1). And under Rule 9(b), knowledge "may be alleged generally." Fed. R. Civ. P. 9(b); *SNAPP, Inc.*, 532 F.3d at 505.

On this front, the Complaint sufficiently alleges that Defendants knew (or recklessly disregarded) that their claims were false under the FCA. For example, as discussed above, Defendants apparently knew the physician compensation agreements took into account referral volume. By design, TriHealth Physicians lost money under those agreements, but TriHealth Hospitals and TriHealth reaped referral-based profits. TriHealth Hospitals and TriHealth subsidized TriHealth Physicians' losses and TriHealth Hospitals paid additional management fees to referring physicians in TriHealth Physicians' employ. Defendants then submitted claims to federal healthcare programs that included items or services resulting from AKS violations or referred by physicians with financial relationships violating Stark. Despite these violations, TriHealth Hospitals certified their compliance with laws including AKS and Stark. (Doc. 50, #702–03). And Defendants did so despite internal policies requiring Stark and AKS compliance and did so in defiance of warnings from Murphy and others. (*E.g.*, *id.* at #619–20).

Defendants urge a different conclusion. They argue these allegations are insufficient under *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023). (Doc. 67, #888–92). In *SuperValu*, the Supreme Court held that defendants "knowingly" submit false claims if "they actually thought that their claims were false" even if a "hypothetical, reasonable person" may have believed the false claims to be valid. 598 U.S. at 749. That is, objective reasonableness provides no safe harbor for a defendant who subjectively believes its claims are false. *Id.* But *SuperValu* does not make "objective measures, such as 'fair market value' (FMV) and MGMA survey data,

irrelevant," as Defendants contend. (Doc. 67, #890). Nor does *SuperValu* require Murphy to "identify specific instances where Defendants expressed doubt about the legality of their conduct or recognized that their claims could be false." (*Id.*). And in any event, Murphy does identify such instances. (*E.g.*, Doc. 50, #627 (alleging that Cercek, then the CEO of TriHealth Physicians, commented that if it takes ten years for the government to prosecute, "bring it on"). As to Defendants' final argument, courts have not "repeatedly held" that proactive measures such as written policies "negate[] any inference of scienter." (Doc. 67, #891 (citing *Sheldon*, 816 F.3d at 414)). *Sheldon* addresses the relator's knowledge, not the defendant's.

Taking Murphy's allegations as true, it's plausible that Defendants, at minimum, recklessly disregarded whether their claims or certifications were false. Therefore, the Complaint meets the FCA's knowledge element. And that means Murphy has sufficiently alleged his direct claims under subparagraphs (A) and (B).

### 2. Conspiracy Claims

Turn next to Murphy's FCA conspiracy claim under subparagraph (C). "[T]o state a conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), a relator must allege, with particularity, 'a plan to get false claims paid.'" *Stevens v. AtriCure, Inc.*, No. 1:22-cv-284, 2024 WL 4171318, at *7 (S.D. Ohio Sept. 12, 2024) (quoting *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 917 (6th Cir. 2017)). And courts require relators to allege "at least one act performed in furtherance of that agreement." *United States v. Postal Fleet Servs., Inc.*, No. 1:19-cv-1900, 2024 WL

1765593, at *18 (N.D. Ohio Apr. 24, 2024) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).

Here, Murphy alleges that Defendants planned to obtain increased profits through compensation for referrals in violation of AKS and Stark, and that Defendants committed numerous acts in furtherance of that plan. As detailed above, TriHealth and TriHealth Physicians, according to Murphy, agreed to pay physicians based on their downstream referrals, increasing overall profits. TriHealth and TriHealth Hospitals then subsidized TriHealth Physicians to offset losses from overcompensating physicians. These allegations are enough to infer an agreement.

Defendants complain that this alleged agreement does not amount to a conspiracy under the intra-corporate conspiracy doctrine. (Doc. 67, #893–94). Under that doctrine, "a corporation cannot conspire with its own agents or employees." *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). In fairness to Defendants, Murphy does allege that Defendants acted as "functionally the same entity." (Doc. 50, #586). But the "allegations involve more actors than merely [Defendants]: these entities are alleged to have conspired with [referring physicians]." *See United States ex rel. Fry v. The Health All. of Greater Cincinnati*, No. 1:03-cv-167, 2008 WL 5282139, at *12 (S.D. Ohio Dec. 18, 2008). And even though TriHealth Physicians employed the referring physicians in some capacity, the referring physicians did not participate in the conspiracy solely in the scope of their employment. *Jackson v. City of Cleveland*, 925 F.3d 793, 819 (6th Cir. 2019) ("[M]embers of the same legal entity cannot conspire with one another *as long as their*

29

*alleged acts were within the scope of their employment.*" (emphasis altered) (quotation omitted)). For example, in negotiations with Defendants over the terms of their employment, referring physicians allegedly demanded increased compensation or else they would take their referrals to competing hospital systems. (Doc. 50, #615). Accordingly, the intra-corporate conspiracy doctrine does not bar the claim. Murphy has stated a conspiracy claim under the FCA.

### 3.    Reverse Claims

Next up is Murphy's reverse claim under subparagraph (G). To state a reverse claim, Murphy must allege that Defendants either (1) knowingly (2) made, used, or caused to be made or used false records or statements material to (3) an obligation owed to the government, or alternatively that Defendants (1) knowingly (2) concealed or improperly avoided (3) an obligation owed to the government. 31 U.S.C. § 3729 (a)(1)(G). An "obligation" includes the "retention of any overpayment." *Id.* § 3729(b)(3). And the obligation must have attached before the defendant made or used the false record or statement. *Ibanez*, 874 F.3d at 916–17.

As detailed above, Murphy alleges that TriHealth Hospitals received payments from federal healthcare programs despite Stark and AKS violations. The Medicare payments for those claims were interim payments. (Doc. 50, #582 (citing 42 U.S.C. § 1395g(a)). At the end of each fiscal year, TriHealth Hospitals submitted cost reports in which they should have reported any overpayments. (*Id.* at #701–04). In those cost reports, TriHealth Hospitals allegedly falsely certified that their submitted claims complied with federal law, including the AKS and Stark. (*Id.* at #702–03). Further,

through the alleged AKS and Stark violations, TriHealth and TriHealth Physicians caused the certifications to be false. *See Fry*, No. 1:03-cv-167, 2008 WL 5282139, at *15 (physicians group defendant caused hospitals certifications to be false by accepting remuneration for referrals).

Defendants counter that they did not have an existing obligation when they made the allegedly false statements. (Doc. 72, #1299–1300 (citing *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 736 (6th Cir. 1999)). But whatever Defendants say, TriHealth Hospitals had an ongoing responsibility to repay interim payments for services performed pursuant to a prohibited referral. *See* 42 C.F.R. § 411.353(d).

Beyond all that, Murphy's reverse claim meets Rule 9(b)'s dictates for the same reasons his direct claims do. Murphy has pleaded the illegal schemes with particularity, identified the false certifications, and provided examples of submitted false claims. Murphy does not need to identity which TriHealth Hospitals employees signed the cost reports; identifying that Good Samaritan and Bethesda North hospitals certified those reports meets the "who" requirement for Rule 9(b). *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 515 (6th Cir. 2007) (explaining that the relator need not plead the "the name of the natural person [employed by the defendant] who submitted the claim"). Therefore, Murphy has stated a reverse claim under the FCA.

31

4.     **Retaliation Claim**

That leaves Murphy's FCA retaliation claim. An employee-plaintiff asserting such a claim must allege three things: "(1) that the employee was engaged in protected activity, (2) that the employer knew that the employee was engaged in protected activity, and (3) that the employer discharged or otherwise discriminated against the employee as a result of the protected activity." *United States ex rel. White v. Mobile Care EMS & Transp., Inc.*, No. 1:15-cv-555, 2021 WL 6064363, at *15 (S.D. Ohio Dec. 21, 2021). Protected activity includes "efforts to stop [one] or more violations of [the FCA]." 31 U.S.C. § 3730(h). And notably, Rule 9(b) does not apply to FCA retaliation claims. *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 460 (6th Cir. 2018).

Start with the first two elements—Murphy's protected activity and Defendants' knowledge. Murphy has sufficiently alleged both. The Complaint states that Murphy "repeatedly objected" to Defendants conduct and "tried to stop" Defendants from violating the AKS and Stark, and cites numerous instances where Murphy did so. (Doc. 50, #711–25). Defendants concede as much. (Doc. 67, #897). But Defendants nonetheless say he falls short on each element. They say Murphy didn't plausibly allege protected activity because he fails to link his objections to fraud on the government. (*Id.*). And they add that Murphy has not adequately alleged knowledge because it isn't clear that Murphy objecting to Defendants' conduct was anything more than Murphy acting "within the scope of his job duties." (*Id.* at #900–

01 (citing *United States ex re. Seabury v. Cookeville Reg'l Med. Ctr. Auth.*, No. 2:15-cv-65, 2021 WL 4594784, at *8 (M.D. Tenn. Oct. 6, 2021))).

But the Court is unconvinced. Murphy's objections to Stark and AKS violations "are inherently tied to the standards for Medicare [and other federal healthcare] billing" and he used "Medicare-billing terminology" related to the Stark exceptions and AKS safe harbor in his complaints to his superiors (for example, "FMV" or "fair market value"). *See Crockett*, 721 F. App'x at 461; *see also Jones-McNamara*, 630 F. App'x at 398–99 (analyzing whether the plaintiff's activity related to potential AKS violations). And Murphy has alleged that Defendants knew he was not simply doing his job. Murphy claims he persisted in objecting to and attempting to stop the allegedly illegal compensation structures even though the CEO warned Murphy "would not 'fit in' if he could not follow [the CEO's] instructions for paying physicians." (Doc. 50, #720–21). So Murphy has adequately pleaded the notice and protected activity elements of his FCA retaliation claim. *See Crockett*, 721 F. App'x at 461.

Turn to the third element—discharge or discrimination. Murphy's allegations clear the threshold here, too. He says that after he presented to the TriHealth Physicians Board about the Stark and AKS compliance issues, Cercek told him: "This just isn't working. I can't have you here saying things to physicians in conflict with Mark [Clement the CEO]." (Doc. 50, #724). Cercek then required Murphy to resign. (*Id.*). In other words, TriHealth allegedly terminated Murphy because of his protected activity.

Defendants, perhaps unsurprisingly, see things differently. They contend that the passage of time "undercuts any inference of causation" because Murphy's objections began almost two years before. (Doc. 67, #902 (citing *Nicholson v. City of Clarksville*, 530 F. App'x 434, 447 (6th Cir. 2013)). True, "[a] time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim." *Nicholson*, 530 F. App'x at 448. But Murphy alleges that his objections culminated in the presentation and that he was required to resign *that same day*. And he does not rely on temporal proximity alone. He also claims Cercek told him that his open disagreement with the CEO's physician compensation practices was the reason for his termination.

So, given that Murphy's Complaint covers each of the three requisite elements, Murphy has validly stated an FCA retaliation claim.

## C.    The FCA's Constitutionality Under Article II.

Having confirmed that Murphy's Complaint otherwise states a claim, the Court turns to Defendants' final argument—that the FCA's qui tam provisions violate two parts of Article II: the § 2 Appointments Clause and § 3 Take Care Clause.[9] As to the former, the Constitution requires that either the President, a department head,

---

[9] As noted above, *Stevens* separates the Article II question from Article III standing. Thus, the question's resolution does not affect the Court's jurisdiction. *Stevens*, 529 U.S. at 778 n.8. That said, because Defendants' Rule 12(b)(1) motion mounts a facial attack to jurisdiction, the Court employs a standard of review similar to the one courts apply to motions brought under Rule 12(b)(6). So if the FCA's qui tam provisions violate Article II, Murphy fails to state a claim under Rule 12(b)(6) because no law supports the claims made. *See Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)).

or the courts, must appoint anyone who is an "officer" of the United States. U.S. Const. art. II, § 2. Defendants argue that FCA relators are improperly appointed officers because they essentially appoint themselves. As to the latter, the Take Care Clause requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And on this front, Defendants contend that the FCA interferes with the President's duties by vesting relators with the power to enforce the law without sufficient executive oversight.[10]

Once again, whatever the Court may think of these constitutional arguments as a matter of first impression, binding caselaw dooms them. The Sixth Circuit has specifically held in a reported decision that the FCA's relator provisions do not violate either the Appointments Clause or the Take Care Clause. *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994). According to *Taxpayers*, a "relator is not an 'officer' within the meaning of the Appointments Clause." *Id.* Therefore, the Appointments Clause's provisions simply do not apply. *Id.* And in that same decision, the Sixth Circuit held that the qui tam provisions likewise do not violate the Take Care Clause because "the Executive Branch retains 'sufficient control' over the relator's conduct to 'ensure that the President is able to perform his constitutionally assigned dut[y.]'" *Id.* (quoting *Morrison v. Olson*, 487 U.S. 654, 696 (1988)).

---

[10] As Defendants point out, the Vesting Clause vests the executive power in the President. U.S. Const. art. II, § 1. Defendants argue that if the FCA vests a relator with executive power in a manner that violates the Take Care Clause, the FCA also violates the Vesting Clause. (Doc. 73, #1314–16). Ultimately, though, the Take Care Clause issue's resolution answers the Vesting Clause question.

As a published Sixth Circuit decision, *Taxpayers* binds this Court. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009). "Of course, if the Court of Appeals is directly reversed by the Supreme Court, or if the facts of the Supreme Court's decision are indistinguishable from those presented to the Court of Appeals, this Court has a clear obligation to follow the Supreme Court." *In re Higgins*, 159 B.R. 212, 215–16 (S.D. Ohio 1993). But "a District Court should be extremely careful in concluding that circuit precedent is no longer good law." *Id.* A district court "should only deviate from such authority where it is powerfully convinced that the circuit will overrule itself at the next available opportunity." *Hollis v. Erdos*, 480 F. Supp. 3d 823, 832 (S.D. Ohio 2020) (quotation omitted); *see also Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987) ("We are bound to follow a decision of the Supreme Court unless we are powerfully convinced that the Court would overrule it as the first opportunity.").

Defendants simply ignore *Taxpayers* in their opening brief, failing to cite it even once. (*See generally* Doc. 64). They attempt to make up for that in their reply, asserting that *Taxpayers* "failed to recognize the more recent, and more specific, arguments addressed by Justice Thomas's dissent in *Polansky* and the Middle District of Florida's ruling in *Zafirov*." (Doc. 73, #1309) (citing *Polansky*, 599 U.S. at 442–52 (Thomas, J., dissenting); *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1306–17 (M.D. Fla. 2024)). But Defendants' description of the sources for their proposed rule—a Supreme Court dissent and a district court case from Florida—serves only to illustrate why their argument fails. "The Court is

36

bound by Sixth Circuit precedent, not a district-court opinion, or even a dissent … by a Supreme Court justice." *United States v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 1:21-CV-84, 2024 WL 4784372, at *2 (E.D. Tenn. Nov. 7, 2024); *see also Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002) (lower courts must follow controlling authority even where "individual Supreme Court justices have expressed reservations").

Beyond that, Defendants do not present any developed argument that *Taxpayers* has been overruled. Instead, without any further explanation, Defendants assert that "[t]he Supreme Court's recent decisions in *Lucia v. SEC*, 585 U.S. 237 (2018), and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), have made clear that individuals exercising significant authority in enforcement actions must be properly appointed under the Appointments Clause and be accountable to the President under the Take Care Clause." (Doc. 73, #1309). True enough. But that does not "powerfully convince" this Court that the Sixth Circuit will overrule *Taxpayers* at its next opportunity. *Hollis*, 480 F. Supp. 3d at 832.

In short, the Court must follow *Taxpayers*. And under *Taxpayers*, the FCA's qui tam provisions do not violate the Take Care Clause or the Appointments Clause.

## D.    Certification for Interlocutory Appeal.

That said, the Court may certify an order for interlocutory appeal if the Court is "of the opinion" that the order hinges on (1) "a controlling question of law," (2) with "substantial ground for difference of opinion," such that (3) immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

37

For purposes of § 1292(b), "[a] legal issue is controlling if it could materially affect the outcome of the case." *In re City of Memphis*, 293 F.3d 345, 351 (6th Cir. 2002). And "[a] substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution, not merely where they have already disagreed." *In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) (quoting *Rees v. BP Expl., Inc.*, 643 F.3d 681, 688 (9th Cir. 2011)). Applying that framework, the Court concludes that this Order satisfies these prerequisites, at least as to the Article II questions.[11]

The Article II questions are certainly controlling. If the FCA's qui tam provisions are unconstitutional, this case presumably cannot proceed (at least absent governmental intervention, which the government has so far declined).[12] And that same logic shows why immediate appeal "may materially advance the ultimate termination of the litigation." *Mobile Care*, No. 1:15-cv-555, 2021 WL 6064363, at *18 (quotation omitted). That is especially true given the nature of this case. FCA actions typically involve extensive discovery, and usually require a substantial investment of both party and judicial resources, all of which would be for naught if the suit is constitutionally defective. *See W. Tenn. Chapter of Assoc. Builders & Contractors, Inc.*

---

[11] In the Court's view, the Order does not meet the § 1292(b) prerequisites as to the Article III standing question because the Supreme Court unequivocally answered that question in *Stevens*. 529 U.S. at 778. That said, certification under § 1292(b) "applies to the *order* certified." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). Accordingly, "even those issues not properly certified are subject to [the Sixth Circuit's] discretionary power of review if otherwise necessary to the disposition of the case." *Pinney Dock & Transp. Co. v. Penn. Cent. Corp.*, 838 F.2d 1445, 1455 (6th Cir. 1988).

[12] The Court expresses no view on whether, if the Sixth Circuit were to conclude the relator is an invalidly appointed "officer," the government could somehow "save" the suit by electing to intervene at that time.

*v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000) (immediate appeal may materially advance the litigation if it might "save substantial judicial resources and litigant expense"). So, the first and third elements are met.

That leaves the second element—whether there is a substantial ground for a difference of opinion. The Court concludes there is. As noted, this Court must follow *Taxpayers* until the Sixth Circuit or the Supreme Court says otherwise. But reasonable jurists certainly could disagree as to whether the FCA violates Article II. Indeed, as Defendants note, a district court recently held the FCA unconstitutional under Article II, pointing to recent developments in Supreme Court precedent involving the Appointments Clause. *Zafirov*, 751 F. Supp. 3d at 1310 (M.D. Fla. 2024) (relying on Supreme Court precedent that "has only solidified the strictures of the Appointments Clause" after *Taxpayers*). An appeal in that matter is pending before the Eleventh Circuit, which has not answered the Article II question. Notice of Appeal, *United States ex rel. Zafirov*, No. 24-13581, (11th Cir. Oct. 30, 2024). Further, in *Stevens*, the Supreme Court's latest express pronouncement on such issues in the FCA context (albeit some twenty-five years ago), that Court expressly reserved the Article II issue. 529 U.S. at 778 n.8 ("[W]e express no view on the question whether *qui tam* suits violate Article II, in particular the Appointments Clause of § 2 and the 'take Care' Clause of § 3."). And, more recently, three Justices have noted that the FCA's qui tam provisions "raise substantial constitutional questions under Article II" that the Supreme Court should consider "in an appropriate case." *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. __,145 S. Ct. 498, 515 (2025) (Kavanaugh, J.,

concurring, joined by Thomas, J.); *Polansky*, 599 U.S. at 442 (Kavanaugh, J., concurring, joined by Barrett, J.); *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting).

As all three of § 1292(b)'s elements are present, the Court certifies this Order for interlocutory appeal. Accordingly, any party may apply for an appeal to the Sixth Circuit within ten days after this Order's entry. 28 U.S.C. § 1292(b). Moreover, the Court stays further proceedings in this action until resolution of the interlocutory appeal process. For clarity, the Court notes that it has reached the same determination in *Shahbabian* and that the Sixth Circuit may wish to consolidate any appeals.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Rule 12(b)(1) motion (Doc. 64) and **DENIES** Defendants' Rule 12(b)(6) motion (Doc. 66). But the Court **CERTIFIES** that this Order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b).

This Order **STAYS** this case until the latest of: (1) expiration of the interlocutory appeal application window, (2) denial of the interlocutory appeal application, or (3) resolution of the interlocutory appeal.

**SO ORDERED.**

July 28, 2025
**DATE**

DOUGLAS R. COLE
**UNITED STATES DISTRICT JUDGE**

40